446 A.2d 918

**David A. McANALLEN**

v.

**Mary E. McANALLEN, Appellant.**

Superior Court of Pennsylvania.

Argued April 12, 1982.

Filed June 4, 1982.

Jane Fay L. Hepting, Chicora, for appellant.

Gwilym A. Price, III, Butler, submitted a brief on behalf of appellee.

Before HESTER, JOHNSON and POPOVICH, JJ.

JOHNSON, Judge:

Appellant (Mother) appeals from an order granting custody of both daughters, Tina and Lisa, to Appellee (Father). The lower court denied Appellant's motion for a stay pending appeal, but our court, per MONTGOMERY, J., granted the stay to allow Appellant to have custody of Tina pending appeal. For the following reasons, we reverse the lower court's order regarding Tina.

## I. FACTS

Appellant and Appellee were married in July, 1975, when Appellant was 16 years old and Appellee was 18 years old. Tina, their first child, was born on February 6, 1976; Lisa was born on September 12, 1978. Appellant and Appellee separated in November, 1978, and were subsequently divorced. When the custody order was entered on September 3, 1981, Tina was six years old and Lisa was almost three years old.

Appellee has remarried and is the father of a child who was 4 months old at the time of the hearing. Also, at the time of the hearing, Appellant had had a nonmarital relationship with another man (Ed) for 2 years and 5 months. Ed and Appellant also have a daughter who is younger than Lisa. Both Ed and Appellant testified that they had postponed their marriage plans until Ed would have a job.

After her separation from Appellee, Appellant, together with Tina and Lisa, returned to her mother's home until April, 1979, when Appellant and Ed established their home together. On May 3, 1979, Appellee was ordered to pay support for Tina and Lisa. A few days later, Appellee refused to return the children to Appellant after the children had spent the weekend with Appellee. Two weeks later, Appellee returned Tina to Appellant because Tina did not want to stay with Appellee.

Appellee filed a petition for custody, and Appellant filed an answer and a cross-petition for custody. At a conference on January 30, 1980, a consent order, which granted custody of Lisa to Appellee and custody of Tina to Appellant, was signed by the lower court.

In February, 1980, after Appellee threatened to move to Texas with Lisa, both parties filed motions; and a second conference was scheduled for March, 1980, before a master. At the recommendation of the master, on March 14, 1980, the judge ordered home evaluations and psychological examinations and continued the proceedings. On August 15, 1980, another conference was held before the master who, after considering the aforesaid reports and evaluations, rec-

ommended that custody of Tina should remain with Appellant and custody of Lisa should remain with Appellee. After several continuances and other motions, a full custody hearing was commenced on April 30, 1981, and concluded on July 14, 1981. On September 3, 1981, the trial judge signed an order granting Appellee custody of both Tina and Lisa.

In addition to Appellant and Appellee, sixteen witnesses testified at the custody hearing. The former supervisor of the abuse unit for Children and Youth Services testified concerning Lisa's failure to thrive in April, 1979, as well as the evaluations of Appellant's home in late April/May, 1980. The witness testified that conditions in Appellant's home in 1980 were very good and that Appellant had "excellent control" over the children. The witness also testified that both children were functioning well in their respective homes and, consequently, she saw "no reason to uproot either of those children to perhaps satisfy the desires of the parents."

The Domestic Relations Officer/Home Study Investigator testified that Appellant and Ed lived in a "large and quite adequate" apartment. He described Appellant and Ed as "two very cooperative people who seemd [sic] to have a stable relationship with each other and with the children...."

Both the Social Service Coordinator for the Headstart Program and Tina's Headstart teacher testified concerning Appellant's and Ed's intense involvement and volunteer work with Headstart. Tina's teacher also testified concerning the "good interaction" between Tina and Appellant. The Parent Involvement Specialist with Headstart testified regarding Appellant's leadership, her ability as an organizer, and her ability to relate very well with others on all levels.

The coordinator of the Parent Infant Center at Butler Hospital stated that both Appellant and Ed "do an excellent job" of parenting. The assistant coordinator of the Parent Infant Center described how Appellant always planned in advance to bring extra diapers, snacks, etc., both for her children and for others.

The witnesses for Appellee were his current wife, Appellee's mother and father, Appellee's current mother-in-law, and two women who babysit for Appellee and his wife. These witnesses testified that Appellee and his wife are excellent parents. Appellee, whose arrearages on the support order of May 3, 1979, were approximately $2,200 at the time of the hearing, stated that he did not pay child support because he did not "feel my kids are being cared for."[1]

## II. THE LOWER COURT'S OPINION

In his opinion, the trial judge explained that, although he had considered the recommendations of the master and of two expert witnesses that Tina should remain with Appellant, he disagreed for the reasons stated in his opinion. In addition to the findings of fact, the court's opinion lists the following factors and proceeds to allot a number of points to Appellant and Appellee for each of these factors:

|   |                  | Appellant | Appellee |
|---|------------------|-----------|----------|
| 1.| Love             | 10        | 10       |
| 2.| Parenting        | 5         | 10       |
| 3.| Responsibility   | --        | 10       |
| 4.| Home             | 5         | 10       |
| 5.| Environment      | --        | 10       |
| 6.| Roots            | --        | 10       |
| 7.| Family stability | --        | 10       |
| 8.| Morals           | --        | 10       |
| 9.| Support          | --        | 10       |

In his very brief discussion of each of the foregoing factors, the trial judge severely criticizes Appellant several times because she is a welfare recipient and because she is not married to Ed. The court also gives Appellant a score of zero on "Roots" because her family does not provide the "beneficial influence" on the lives of the children that Appellee's parents provide. The court criticizes Appellant several times as a "welfare recipient who will probably continue to be dependent on welfare and social services." This dis-

1. Although Judge HESTER, in his Concurring Statement, would remand to determine the amount of support, plus arrearages, that Appellee should pay to Appellant for the support of Tina, we believe that the issue of support is not before our court in this appeal.

cussion echoes the court's finding of fact no. 9 which states in part:

> Mary Cousins McAnallen [Appellant] is weak and dependent. She lacks self discipline and has not functioned acceptably as a housekeeper and mother without guidance and supervision. Her background of neglect and deprivation, her conduct after marriage combined with inherent weaknesses, are evidence that her life career will be as a welfare recipient. Mary loves her children and will care for them under guidance and supervision.

## III. DISCUSSION

■ Since the record in the instant case is comprehensive and the essential facts are not in dispute, we are able to consider the merits of the instant case. *Commonwealth ex rel. Oxenreider v. Oxenreider*, 290 Pa.Super.Ct. 63, 70, 434 A.2d 130, 133 (1981). The primary concern in a custody case is the "best interest and permanent welfare of the child." *Commonwealth ex rel. Pierce v. Pierce*, 493 Pa. 292, 295, 426 A.2d 555, 557 (1981). In determining what arrangement would serve the best interests of the child, our scope of review is of the broadest type. *Id.*, 493 Pa. at 296, 426 A.2d at 557; *Commonwealth ex rel. Oxenreider v. Oxenreider*, 290 Pa.Super.Ct. at 69, 434 A.2d at 132; *Commonwealth ex rel. Berman v. Berman*, 289 Pa.Super.Ct. 91, 93, 432 A.2d 1066, 1067 (1981). "We must exercise an independent judgment based on the evidence and make such an order on the merits of the case as right and justice dictate." *Commonwealth ex rel. Pierce v. Pierce*, 493 Pa. at 296, 426 A.2d at 557.

■ Our review of the testimony in the instant case reveals a picture of Appellant's development from a teen-aged mother who, by her own admission, made a lot of mistakes, to a well-organized, competent 22-year-old mother. Contrary to the lower court's interpretation that Appellant is a good parent only "with guidance and help" and that she will "probably continue to be dependent on welfare and social services," the testimony of the various coordinators of

these services reveals a totally different image of Appellant. Both Appellant and Ed work in the Headstart classroom as teacher's aides; and Appellant is the chairperson of the organization of parents involved with Headstart while Ed is the treasurer. Appellant has worked on various committees, has organized fundraisers, has arranged for speakers, has worked in community relations, and has "been very organized and very mature in the handling of these things." Also, Appellant has now obtained her G.E.D. diploma.

The record reveals that, although Appellant made mistakes regarding the care of Lisa in 1979, Appellant had the good sense to seek help and to benefit by that help so she is now a very capable parent.

The social service coordinators also testified that Ed is an excellent parent. The relationship of Appellant and Ed, as reflected in the record, is a stable and happy one.

One of the principal reasons for the lower court's decision not to grant custody to Appellant is the relationship of Appellant and Ed. Under "Morals," the judge states:

Like mother—like daughter. A daughter can be expected to be greatly influenced by the life-style of the mother with whom she resides. To pattern their life after that of Mary is not in the best interests of either child.

Sharon, as a mother and housewife married to their father, is a good example for the children. Mary's relationship with Edward and their illegitimate child is not a good model for the children.

Although the lower court utilizes the terminology regarding the best interests of the child, the court cannot point to any testimony that Appellant's relationship with Ed has an adverse effect upon the children. As our court stated in *G. J. F. v. K. B. F.*, 284 Pa.Super.Ct. 139, 425 A.2d 459 (1981),

[T]he court's function in custody cases is not to penalize one party for breaching a perceived moral code; rather, it is to determine how the interests of the children will best be served. [Citations omitted.]

*Id.,* 284 Pa.Superior Ct. at 141–142, 425 A.2d at 460. The trial judge must never impose his own moral code upon the facts in a custody dispute:

Everyone develops a code of personal conduct. It does not follow that one is entitled to impose that code on others, or penalize those who do not conform to it. Especially in a child custody case is it important that the hearing judge distinguish between his personal code of conduct, and his determination of what is in the children's best interest. One may believe, with the utmost conviction, that certain conduct is wrong, and yet it may be that that belief should have little or no part in determining who should have custody of the children. A judge may believe that "lips that touch liquor shall never touch mine," but he is not for that reason to deny custody to a mother who drinks. A judge may be a devout churchgoer, but he is not for that reason to deny custody to a mother who does not go to church. Or, as here, a judge may believe that it is immoral for an unmarried woman to have sexual intercourse, but he is not for that reason to deny her custody of her children. See *Commonwealth ex rel. Myers v. Myers,* 468 Pa. 134, 360 A.2d 587 (1976) (collecting and discussing cases); *Gunter v. Gunter,* 240 Pa.Super. 382, 361 A.2d 307 (1976). Of course, "a parent's nonmarital relationships must be given close scrutiny in determining custody matters." *Commonwealth ex rel. Myers v. Myers,* supra, 468 Pa. at 138, 360 A.2d at 589. The purpose of the scrutiny, however, is only to determine the impact of the relationship on the children:

[I]t is the effect of the nonmarital relationship on the child and not the fact of the relationship itself which is crucial to a custody decision. If the evidence shows that a parent's conduct has had harmful effects on the child the court may be justified in denying custody to that parent. *On the other hand, if the evidence shows that the parent's conduct has not adversely affected the child and that the parent has taken good care of the child, then the best interest of the child may dictate that the*

*parent retain custody.* In each case, all relevant circumstances must be examined to determine what action would be in the best interest of the child. *Commonwealth ex rel. Myers v. Myers,* supra, 468 Pa. at 141, 360 A.2d at 590.

The controlling words in this statement of the law are, "if the evidence shows . . . ." The court must never assume, or infer, that simply because a nonmarital relationship exists, the impact of the relationship on the children has been harmful. The evidence must show that it has been harmful, and this is so whether the nonmarital relationship, as in *Myers* and *Gunter,* approaches a *de facto* marriage or, as in this case, is more transient.

*Robert H. H. v. May L. H.,* 293 Pa.Super.Ct. 431, 437, 439 A.2d 187, 190 (1981) (quoting SPAETH, J., Dissenting Opinion in *Commonwealth ex rel. Grimes v. Grimes,* 281 Pa.Super.Ct. 484, 498–499, 422 A.2d 572, 579–580 [1980] ). [Citations omitted.]

In the instant case, the trial court's emphasis upon the moral aspects of Appellant's relationship with Ed constituted error because the testimony revealed that this relationship did not have an adverse effect upon the children. *See G. J. F. v. K. B. F.,* 284 Pa.Super.Ct. at 141, 425 A.2d at 460.

■ Likewise, the lower court erred in its analysis of the parties' respective financial situations and their effect upon the children:

Two families cannot live as cheap as one family. An order of support on David [Appellee] will either be inadequate to support a child or will deprive the family maintained by David and Sharon. When the parents are equally capable of caring for a child, the resources of the producer should not be divided by a support order. Generally a support order inflicts not only economic hardship but continuing conflict between the parents. The children are the victims, economically and emotionally. These problems for the children can be avoided by awarding custody of the children to David.

If the foregoing analysis were correct, custody should always be granted to the wage earner so that his/her income would not be divided by a support order. Obviously, this principle docs not consider the best interests of the child.

The lower court asserts that the children in the instant case will be spared possible emotional and economic hardships if they are placed in Appellee's custody. To award custody to Appellee in order to spare the children these nonexistent problems is to ignore all of the other aspects of the children's well-being and best interests. The lower court erred in utilizing this factor as a basis for its decision.

Rather than vacate the lower court's order and remand for further proceedings as our court did in *G. J. F. v. K. B. F.*, we can decide the merits of the instant case since the record is complete. *Commonwealth ex rel. Oxenreider v. Oxenreider*, 290 Pa.Super.Ct. at 73, 434 A.2d at 135; *Pamela J. K. v. Roger D. J.*, 277 Pa.Super.Ct. 579, 592, 419 A.2d 1301, 1311 (1980).

■ As this opinion has indicated, the entire record indicates that Lisa has been thriving in Appellee's custody and Tina has been thriving in the custody of Appellant. Both the master and two social service coordinators recommended that Tina and Lisa should remain with Appellant and Appellee respectively. The record supports an order awarding custody in the aforesaid manner.

Our court has expressed a policy that, absent compelling reasons, siblings should not be separated. *Albright v. Commonwealth ex rel. Fetters*, 491 Pa. 320, 327, 421 A.2d 157, 160 (1980); *In re Davis*, 288 Pa.Super.Ct. 453, 464, 432 A.2d 600, 606 (1981). Since the best interests of the children in the instant case must prevail over any abstract policy, we will not disturb the happy and stable relationships that Appellee has established with Lisa and Appellant has established with Tina. *See Commonwealth ex rel. Hughes v. Foster*, 225 Pa.Super.Ct. 436, 311 A.2d 663 (1973).[2]

2. Cited as *Commonwealth ex rel. Foster v. Foster* in 311 A.2d 663 (1973).

For the foregoing reasons, we affirm that portion of the lower court's order that grants custody of Lisa to Appellee and reverse that portion of the order that grants custody of Tina to Appellee. Instead, we award custody of Tina to Appellant.

The case is remanded for further proceedings as necessary to establish appropriate visitation and partial custody rights of Appellant and Appellee not inconsistent with the foregoing opinion and order.

HESTER, J., files a concurring statement.

HESTER, Judge, concurring:

I concur in the result reached by the majority wherein custody of Tina McAnallen has been awarded to the appellant, her mother. The record indicates that disposition will best serve the interests of the child.

However, I do not agree with the reasoning of this Court as set forth in *G. J. F. v. K. B. F.*, 284 Pa.Super. 139, 425 A.2d 459 (1981), and in *Robert H. H. v. May L. H.*, 293 Pa.Super. 431, 439 A.2d 187 (1981), wherein it is pronounced that it is the effect of the nonmarital relationships of the mother upon the child and not the fact of the relationship itself which is crucial to a custody decision. The fallacy of that position is that the harmful effects upon young, female children, of their mother's open, notorious, and numerous nonmarital relationships cannot possibly be evaluated until the child is in a position to emulate the conduct of her mother, normally in puberty, long after custody has been determined. The lower court judge, in the within appeal, was accurate in his observation that, "Like mother-like daughter."

In addition, I would add to the remand the obligation of determining the amount of support to be paid by appellee to appellant for the support of Tina, plus the amount to be paid by appellee towards the arrearages.